UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

LOUISIANA GENERATING LLC, ET AL                CIVIL ACTION

VERSUS

ILLINOIS UNION INSURANCE COMPANY, ET AL        NO. 10-516-JJB

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

This case is before the Court on two cross-motions for summary judgment. Defendant Illinois Union Insurance Company (Illinois Union) filed the first motion (Doc. 298), and plaintiff Louisiana Generating LLC (LA Gen) filed the second (Doc. 327). Both parties filed oppositions (Docs. 337, 341) and replied to the other party's opposition (Docs. 346, 347). LA Gen also filed a Motion in Limine (Doc. 324), and Illinois Union filed an opposition (Doc. 342) to that motion. Further, Illinois Union recently filed a Motion for Judicial Notice (Doc. 349), and LA Gen filed an opposition (Doc. 355). Before filing its summary judgment motion, Illinois Union filed a Motion for Continuance to Complete Discovery with a Request for Expedited Consideration (Doc. 292) designed to delay disposition of any summary judgment motions until further discovery could be completed; LA Gen filed an opposition (Doc. 322). Later, Illinois filed a Motion to Stay Summary Judgment Proceedings Pending Resolution of Discovery Issues (Doc. 352), and LA Gen has yet to file an opposition; however the time for LA Gen to file has not yet run. Oral argument on these motions is unnecessary.

### Background

The dispute centers on an insurance policy that Illinois Union issued to LA Gen and whether it covers certain costs arising out of a consent decree addressing violations of the Clean Air Act (CAA) and Louisiana environmental regulations at LA Gen's BCII Power Plant (BCII).

1

In a separate action, the Environmental Protection Agency (EPA) and Louisiana Department of Environmental Quality (LDEQ) sued LA Gen over these violations, and that suit ended with the consent decree. While that action was pending, LA Gen sought defense from Illinois Union, who refused on the grounds that there was, unequivocally, no coverage. In a prior ruling—which the Fifth Circuit affirmed (Doc. 157)—this Court (Doc. 111) found that Illinois Union had a duty to defend LA Gen in the enforcement action involving the EPA and LDEQ. The Court based its ruling on the possibility of coverage, which was sufficient to trigger the duty to defend, and specifically acknowledged that it did not reach the question of actual coverage and the duty to indemnify. (Doc. 111 at 1, 8–9).

Actual coverage and the duty to indemnify are now before the Court. Significantly, the entire consent decree is not at issue; rather, only three particular expenses that LA Gen incurred are disputed by Illinois Union. The three disputed portions of the consent decree are: "the costs of installing Selective Non-Catalytic Reduction (SNCR) technology at BCII Unit 3; . . . the surrender of emissions allowances; and . . . 'Mitigation Projects.'" (Doc. 298-1 at 6). Under the consent decree, LA Gen agreed to install SNCR technology at Units 1, 2, and 3 to address issues with Units 1 and 2,[1] but because it acknowledges that the costs to do so on Units 1 and 2 are compliance costs, it only seeks coverage related to the Unit 3 costs. LA Gen must also, under the consent decree, permanently surrender its emissions allowances for $NO_x$ and $SO_2$; this is intended to create the practical effect of reducing emissions of both chemicals. The final disputed costs are those associated with a slew of "Mitigation Projects" that LA Gen must undertake, including $500,000 to the National Park Service to support projects designed to address air pollution.

---

[1] In the underlying enforcement action, only Units 1 and 2 were at issue.

Whether the policy covers the contested costs essentially comes down to methods of contract interpretation. LA Gen's policy includes, in its coverage clause, the following language:

> "Claims", "remediation costs", and associated "legal defense expenses", in excess of the "self-insured retention", as a result of a "pollution condition" on, at, under, or beyond the boundaries and that migrated from the "covered location(s)", provided the "claim" is first made, or the "insured" first discovers such "pollution condition" during the "policy period". Any such "claim" or discovery must be reported to the Insurer, in writing, during the "policy period" or any applicable "extended reporting period."

(Doc. 111 at 4). The policy also includes a list of definitions, and the primary issue here is "remediation costs," which the policy defines:

> "Remediation costs" means reasonable expenses incurred to investigate, quantify, monitor, mitigate, abate, remove, dispose, treat, neutralize, or immobilize "pollution conditions" to the extent required by "environmental law."

*Id*. at 5. In their motions, the parties argue multiple points, but the approach to defining "abate" and "mitigate" from the "remediation costs" section is most critical, though there are other important issues involved as well.

In addition to claiming that the policy does not cover these three costs, Illinois Union challenges that several aspects of the costs are unreasonable. LA Gen, according to Illinois Union, failed to fulfill some of its obligations in the most efficient manner possible; Illinois Union also argues that the surrender of emissions should be valued with Entergy's co-ownership of unit 3 in mind. Further, there are several pending discovery motions regarding additional materials that Illinois Union requested. These motions primarily deal with documents related to the negotiations between LA Gen and the EPA leading up to the consent decree. LA Gen has vigorously opposed all of the motions.[2] Due to the number of outstanding discovery motions,

---

[2] Their arguments include, but are not limited to, confidentiality and relevance.

Illinois Union filed its motion to stay in addition to its motion to extend discovery because it feels that the outcome of its discovery motions could affect the summary judgment analysis.

## Standard of Review

A motion for summary judgment should be granted when the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, show that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The admissibility of evidence for summary judgment purposes conforms to the rules of admissibility at trial. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004) (citations omitted). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Whether a fact is material will depend on the substantive law. *Id*. When addressing a summary judgment motion, the court must make reasonable inferences in favor of the non-moving party. *Evans v. City of Bishop*, 238 F.3d 586, 589 (5th Cir. 2000). If the movant meets his initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmovant to identify or produce evidence that establishes a genuine dispute of material fact. *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 621 (5th Cir. 2000).

## Analysis

As a preliminary matter, New York state law applies to this contract and its interpretation. To address this controversy, the Court must evaluate the contract's language under New York's maxims of interpretation and determine whether these three expenses are covered. This requires, first, settling the dispute over how to interpret "mitigate" and "abate," as the

parties offer dueling approaches to defining these terms. Second, after establishing the meaning of these terms, the Court must consider whether, under that definition, the expenses at issue were contemplated as part of the policy. Third and finally, the Court must, if it does find coverage, address the arguments about the reasonableness of the expenses.

I. Defining Terms

In New York, the first step to interpreting an insurance policy is to look to the policy's language. *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277 (1st Dep't 1990). When policy terms are unambiguous, they are given their plain meaning. *Id*. Language is ambiguous when it is reasonably susceptible to more than one meaning. *MDW Enters., Inc. v. CNA Ins. Co.*, 772 N.Y.S.2.2d 390, 398 (1980). If there is an ambiguity, courts may use extrinsic evidence to resolve the issue. *State v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985). If extrinsic evidence does not produce a resolution, "[t]he policy must . . . be construed in favor of the insured, and ambiguities . . . resolved in the insured's favor . . . ." *United States Fid. Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 232 (1986). This rule does not merely benefit insured laypersons; it applies to sophisticated insureds as well. *Morgan Stanley Grp v. New England Ins. Co.*, 225 F.3d 270, 279 (2d Cir. 2000). These are general principles of interpretation, and Illinois Union argues that an exception applies due to the nature of their insurance contract.

A. Methods of Interpretation

Illinois Union argues that "mitigate" and "abate," in environmental law, should be understood as terms of art relating to violations of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). It claims that the decision in *Belt Painting Corp. v. TIG Ins. Co.* demonstrates that certain terms, in the context of environmental law, should be "afforded their proper meaning" in that context. 763 N.Y.S.2d 790, 795–96 (N.Y. 2003); (Doc.

5

298-1 at 10). In *Belt Painting*, a case about a pollution exclusion clause in an insurance contract, the court ruled that the insurer's pollution exclusion clause did not apply to certain "paint or solvent fumes" that caused injury and created liability for the insured. *Id*. at 793. There, applying the principle that ambiguous terms insurance contracts are interpreted against the insurer, the court held that "discharge" and "disposal" were terms of art in environmental law, and a reasonable insured, understanding its place in the policy, would not believe these excluded liability incurred due to injuries caused by "the insured's tools of the trade." *Id*. at 795. LA Gen argues that Illinois Union is misapplying the case and misrepresenting its holding. According to LA Gen, the court in *Belt Painting* endorsed the "common meaning" maxim, even in the pollution insurance context, and its ruling relies upon the principle of interpreting ambiguous provisions against the insurer.

Illinois Union's argument is not persuasive. LA Gen correctly describes *Belt Painting*: Rather than the maxim that "environmental law terms" should be treated as "terms of art," it instead demonstrates that ambiguous terms are interpreted against insurers and in a manner that a reasonable businessperson would expect. The court even states that it is "reluctant to adopt an interpretation that would . . . contradict both a 'common speech' understanding of the relevant terms and reasonable expectations of a businessperson." *Id*. Further, the cases offered by Illinois Union that cite *Belt Painting* narrowly read the decision to refer to specific terms within a pollution exclusion policy and further reiterate the importance of the "common meaning" approach, just as the court in *Belt Painting* did. *E.g. Colonial Oil Industries Inc. v. Indian Harbor Ins. Co.*, 528 Fed.Appx. 71, 74–75 (2d Cir. 2013). Consequently, "mitigate" and "abate" are to be given a construction congruent with their plain meaning and the expectations of a reasonable insured.

B. Mitigate and Abate

In its memorandum, Illinois Union first argued that the previous rulings in this case—both from this Court and the Fifth Circuit—are not relevant due to the different analyses required for the duty to defend and the duty to indemnify. Illinois Union, though it did so under the guise that mitigate and abate were "terms of art," also argued that the context of the provision supports an interpretation that limits its application to CERCLA liabilities "rather than permitting and compliance statutes such as the Clean Air Act." (Doc. 298-1 at 11). They rely heavily on Michael Gerrard's[3] expert report, which combines an extensive review of EPA materials, Professor Gerrard's "experiences as an environmental law practitioner," and the history of environmental laws in the United States to conclude that the language indicates that the policy is limited to CERCLA-type clean-ups. *Id*. at 10–12.

LA Gen disputes Illinois Union's characterization of the prior rulings; though it acknowledges that the analyses are different, it contends that the interpretations—the Fifth Circuit's in particular—control here. Although how these interpretations factor into the analysis differs between the duty to defend and the duty to indemnify, according to LA Gen, these interpretations do not change. They also argue that the policy never limits itself to CERCLA events, so an interpretation of remediation costs that produces that result is improper. Other definitions within the policy, such as that of "pollution condition," include language suggestive of air pollution, such as "gaseous" or "fumes," and LA Gen argues that this reinforces their arguments for a broad, inclusive interpretation. Finally, LA Gen refers to the dictionary definitions of "mitigate" and "abate" and claims that these definitions cover a "wide range" of activities.

---

[3] Michael Gerrard is a professor of environmental law at Columbia University.

The first question, under New York law, is whether the terms are ambiguous. Although both parties offered extensive extrinsic evidence, which can be used to determine meaning when terms are ambiguous, context—they are surrounded by a number of other terms that suggest no special meaning—demonstrates that "mitigate" and "abate" should be understood in the ordinary sense. As LA Gen points out, the definition of "mitigate" traditionally includes the notion of becoming "'less severe'" or "'less harsh or hostile.'" (Doc. 337 at 12). Similarly, "abate" is often defined using language such as "'reduce in degree'" or "'moderate.'" *Id*. at 13. These definitions are also consistent with the Fifth Circuit's prior ruling, and although the analysis for duty to defend versus duty to indemnify is different, the maxims of interpretation do not change. LA Gen correctly noted that how the Court applies the terms might change, but the methods for determining what these terms mean do not change. Therefore, the Court will use the plain meaning of "mitigate" and "abate" to determine whether either party is entitled to summary judgment.

II.     Determining Whether Coverage Exists

Now that the Court has determined how to define "mitigate" and "abate," the next step is to evaluate the policy and whether it applies to the disputed costs. The parties argued extensively in both of their support and opposition memoranda, citing a large body extrinsic evidence, and in light of this, and a careful reading of the policy, it is clear that whether there is coverage is an ambiguous question. As a result, the Court must look to the extrinsic evidence and attempt to dispel the confusion. There is also a moral hazard argument raised by Illinois Union, which the Court will also address.

A. Interpreting the Policy and Extrinsic Evidence

There are three costs at issue here, and although there are general interpretation arguments that apply to all three, the parties do make some arguments unique to each of the three matters at issue. After addressing the all-encompassing principles, the Court will address each of the three disputed costs separately.

Illinois Union relies heavily on the export report of Professor Gerrard to support its "terms of art" argument, and this report is the backbone of their position here, as well—they use it to support a narrow reading of the policy generally. They also argue that should the Court find coverage here, the policy would be absurdly broad and without a logical end; that is, it could be read as to encompass pollution far into the future. LA Gen's arguments, meanwhile, primarily use the plain reading approach; they argue that the three costs fall clearly within the common meanings of the terms used in the policy, particularly "remediation costs." According to LA Gen, Illinois Union could have used narrowing language in the policy, but it instead chose to draft it in "sweeping terms." (Doc. 337 at 11).

i. SNCR Technology on Unit 3

The distinction between future and past costs is the focal point of Illinois Union's argument. According to Illinois Union, "remediation" implies that, to be covered, a cost should address past emissions, and the installation on unit 3 only affects future emissions. Further, Illinois Union argues that installing the SNCR was a compliance measure[4] because it helped bring LA Gen into regulatory compliance in lieu of further work[5] on units 1 and 2. Similarly, even with the measures taken regarding units 1 and 2 and the installation of SNCR on unit 3, the reduction in emissions will not equal that which the technology LA Gen should have installed—

---

[4] If it were a compliance measure, it would not be covered by the policy.
[5] The work on units 1 and 2 is not at issue, as LA Gen did not claim it under the policy.

9

to avoid running afoul of the regulations—would have achieved. Therefore, Illinois Union argues, because the installation on unit 3 contributes to reducing emissions toward the required amount, it is a compliance measure, not a remediation cost. Illinois Union also points out that unit 3 violated certain regulations as well and claims that this renders the work on it to be compliance work.

LA Gen first argues that, legally, they could not have traded lower emissions at unit 3 for lower compliance requirements at units 1 and 2. Instead, according to LA Gen, compliance is limited to the particular unit that requires work to become compliant with EPA regulations. Regarding Illinois Union's argument that, because units 1 and 2 are not in full compliance, the EPA's stipulations concerning unit 3 also achieve compliance, LA Gen claims that Illinois Union is essentially arguing that LA Gen should be penalized for entering the consent decree and obtaining a better result than a potential full loss at trial—ignoring the point of legal settlements completely. Finally, LA Gen counters that even if unit 3 violated any regulations, the EPA never filed notices regarding unit 3 nor was unit 3 part of the underlying litigation between the EPA and LA Gen.

Based on a plain reading of "mitigate," "abate," and "remediation costs," coupled with the extrinsic evidence available, the installation on unit 3 qualifies under the policy. As LA Gen points out, Illinois Union wrote the policy; narrower language exists, of which Illinois Union was presumably aware, yet they chose to write the policy without using that language. "Remediation" may imply a past wrong, but to say that it requires addressing that exact wrong here—the emissions—by removing the emissions is incorrect. These emissions have effects on the environment, and by reducing future emissions, the past emissions can be "remediated" as the environment naturally eliminates the chemicals and, due to the lower emissions, there are fewer

new chemicals to take their place. Although Illinois Union correctly points out that settlements can legally include trade-offs instead of full compliance, that does not make these trade-offs compliance measures. Rather, LA Gen offered to undertake additional remediation efforts—reducing emissions from unit 3—in lieu of getting units 1 and 2 into full compliance; the EPA found this satisfactory and accepted. Illinois Union's other arguments are likewise unpersuasive; its argument about "full compliance" attempts to punish LA Gen for settling and limiting its liability exposure,[6] and the Court will not consider purported violations that the EPA never raised in its underlying complaint. Therefore, there is no genuine dispute of material fact, and LA Gen is entitled to judgment as a matter of law on the question of whether the unit 3 installation is covered by the policy.

        ii.        Mitigation Projects

Illinois Union argues that LA Gen must demonstrate that "each individual project constitutes a form of redressing past emissions . . ." and cannot establish this link. (Doc. 341 at 14). It elaborates by claiming that the policy requires that these mitigation projects directly "mitigate, abate, neutralize, treat, etc." the excessive emissions that triggered the underlying enforcement action. *Id*. at 15. Their expert, Paul Murphy (Murphy), rejected the connections that LA Gen offered, opining that "geographical proximity or locality alone does not establish the requisite nexus . . . ." *Id*. at 15–16. LA Gen, according to Illinois Union, has no documentation or studies demonstrating that the excess emissions from LA Gen's facility had effects on the geographic areas covered by the mitigation projects. Illinois Union also argues that these policies are more appropriately categorized as Supplemental Environmental Projects (SEP) and are not be covered. Finally, Illinois Union notes that one of the projects, involving the False River, addresses nitrogen, which was not at issue in the consent decree—$NO_x$ is the chemical at issue.

---

[6] This protects, potentially, both LA Gen and Illinois Union from additional costs.

LA Gen's main argument is that Illinois Union has offered no basis for its statements about the strength of the connection required for coverage to exist. They point out that Illinois Union cited neither case law nor the policy and note that the policy contains no such language. In the consent decree, LA Gen notes, the EPA requires that the mitigation projects, to earn approval, have some "nexus" to the excess emissions. (Doc. 337 at 19–20). Indeed, the EPA rejected two of LA Gen's suggested projects for lacking a sufficient connection. *Id.* In response to Illinois Union's argument that these are SEPs, LA Gen argues that Illinois Union did not give a reason why SEPs would not be covered under the policy. Further, according to LA Gen, the report to which Illinois Union cited only referred to SEPs to "clarify terminology," not create a excluded category of projects. *Id.* at 20. LA Gen's last argument responds to the False River project allegation and involves a scientific explanation of how the NOx emissions would cause "nitrogen load" in the water. *Id.*

Illinois Union lacks support for their assertion that such a strong nexus is required. The plain language, again, does not support holding LA Gen to such a stringent standard; the policy does not indicate that its use of "remediation" or "mitigate" or "abate" is intended to reflect a stricter standard than the ordinary meaning of each word. Further, LA Gen provided ample external evidence to support its position. Illinois Union's other arguments similarly fall flat. First, as LA Gen noted, Illinois Union fails to show that, even if these projects are SEPs, why they would be excluded under the policy. Second, LA Gen's expert adequately explained the connection between the False River project and the excess emissions; further, the EPA accepted this project, supporting LA Gen's position that these chemicals are related. Consequently, there is no genuine issue of material fact, and LA Gen is entitled to judgment as a matter of law on the issue of whether the mitigation projects are covered by the policy.

iii.     Surrender of Emission Allowances

LA Gen's surrender of its allowances, under the consent decree, is permanent, and Illinois Union argues that this indicates that the emission allowances are not about mitigation. According to Illinois Union, the permanent nature of the surrender, along with the negotiations' occurring during the compliance phase, rather than later when the parties discussed the mitigation projects, suggests this was part of the compliance aspect of the consent decree. Additionally, Illinois Union makes another trade-off argument: LA Gen surrendered its emission allowances instead of achieving full compliance with emission standards. Finally, Illinois Union notes that LA Gen maintained its "Super-Compliant" allowances,[7] which, according to Illinois Union, it may use to pollute, so the allowances in general cannot be mitigation. (Doc. 298-1 at 25).

According to LA Gen, Illinois Union is reading the policy unreasonably narrowly. LA Gen argues that it may have permanently surrendered its allowances in lieu of greater reductions in emissions from units 1 and 2, but that does not make the surrenders part of compliance costs. Simply put, LA Gen claims, surrendering the allowances mitigates the pollution caused by the previous excessive emissions from units 1 and 2. Further, LA Gen also refers to the Fifth Circuit's prior ruling and claims that it settled this issue already by indicating that surrendering emissions would be covered under the policy. *Louisiana Generating, LLC v. Illinois Union Ins. Co.*, 719 F.3d 328, 335 (5th Cir. 2013).

The language that Illinois Union relies upon does not support such a narrow reading of "remediation." Its other evidence, such as the retention of "Super-Compliant" allowances, is no more supportive of the restrictive interpretation—these higher allowances may be used "to

---

[7] Instead of allowing to trade in allowances when one is below the emission standards, a super-complaint allowance requires that the trader maintain a much lower emission level.

pollute," but only if LA Gen greatly reduces its emissions. There is no guarantee that should LA Gen ever achieve such allowances, its trade in them will result in an amount of pollution equal to that avoided by LA Gen to earn the allowances. LA Gen's construction of the Fifth Circuit's language in its prior ruling is questionable, but its reliance on the dictionary definitions of remediation is not. Just like reducing emissions on unit 3 could be traded for full compliance while remaining a remediation measure, surrendering emissions allowances can be similarly traded without becoming a compliance measure. Therefore, there is no genuine issue of material fact, and LA Gen is entitled to judgment as a matter of law on the question of whether its surrender of emission allowances

    A. Moral Hazard

Notwithstanding any interpretation of the policy's language or intent, Illinois Union argues that there is a profound moral risk should the Court find coverage here. Essentially, according to Illinois Union, pollution insurance would become too dangerous for insurers because the insureds could simply pollute at will and then have insurance cover their expenses. LA Gen argues that Illinois Union had ample opportunity to evaluate the risks that insuring LA Gen would pose and that Illinois Union was aware of the pollution conditions at BCII when the parties entered into the contract.

Illinois Union's arguments ignore that it has the power to write its policy more narrowly or to determine that a potential insured is too big of a risk before insuring them. As LA Gen points out, Illinois Union had the opportunity to evaluate LA Gen as a client, presumably did so (or should have), and decided to provide coverage. They accepted the premiums and, as a result, accepted the risk. LA Gen also covered some of the costs of the consent decree itself, such as the compliance costs related to units 1 and 2, indicating that Illinois Union's nightmare scenario is

14

not a practical risk; pollutants will still pay to keep their equipment up-to-date or should the compliance costs. Consequently, the moral hazard argument does not overcome the reasonable interpretation of the contract.

   III.   Reasonableness of Costs

In addition to coverage disputes, Illinois Union also alleges that some of the costs incurred for the installation on unit 3 are unreasonable, and it quibbles about the valuation of the surrenders of allowances due to Entergy's co-ownership of unit 3. One of Illinois Union's experts, Thomas Nunno (Nunno), described in great detail several costs that should not be covered. These included improperly distributed vendor costs, costs due to purportedly unreasonably delays, and costs to hire outside firms to finish the work. LA Gen contends that Nunno improperly characterized the distributed costs, claiming that they only distributed common costs evenly across all three units—not every single cost.[8] Further, LA Gen explains that these delays were due to extreme cold weather and wintry conditions caused by the "polar vortex" as well as the discovery of "lead paint and a buried diesel pipe," which forced work stoppages. Finally, LA Gen argues that they lacked sufficient internal personnel to complete the work without hiring outside assistance. Regarding co-ownership with Entergy, LA Gen argues that the policy does not support a reduction based on the co-ownership of unit 3.

LA Gen's explanations sufficiently explain why their costs are reasonable. Their expert differentiated the costs that were actually spread evenly, and why, across the units. The work stoppages were due to events that they could not reasonably expect, and they have adequately demonstrated that they could not undertake the entire installation without the outside help. Additionally, although Entergy does own 42% of unit 3, Illinois Union has not demonstrated that

---

[8] This would be inappropriate because several of the costs required substantially more work on units 1 and 2, which are not at issue, than unit 3.

their policy excludes any payment based on this. They argue that this would be a form of double recovery, but the consent decree requires LA Gen to install the SNCR on unit 3, not Entergy. Consequently, there is no genuine dispute of material fact regarding the reasonableness of these costs, and LA Gen is entitled to judgment as a matter of law.

IV. Motion in Limine

In reaching its decision on the cross-motions for summary judgment, the Court considered the expert testimony of Illinois Union's experts, including those challenged in LA Gen's motion in limine. As a result, the motion in limine is denied.

V. Motion for Judicial Notice

Judicial notice is appropriate when a fact is both relevant and not in dispute. *Vallot v. Cen. Gulf Lines, Inc.*, 641 F.2d 347, 351 (5th Cir. 1981). Illinois seeks judicial notice of the "existence and content of all pleading, exhibits, rulings[,] and documents filed in the Underlying Action." (Doc. 349 at 2). These are public records, according to Illinois Union, justifying judicial notice. Further, they ask for disclosure of all redacted materials from the underlying action that the Court may use in its summary judgment ruling. LA Gen notes that Illinois Union has made a request for every document without identifying why any particular document would be relevant. They also point out that they have no authority to violate the protective order in the enforcement action, for it concerns the privacy and confidentiality interests of third parties.

As LA Gen points out, Illinois Union made no effort to specify why all of the documents for which it seeks judicial notice are relevant. In no conceivable scenario would every document from that case be relevant here, so the Court will not take judicial notice of every single one. Regarding the redacted materials, Illinois also lacks specifics. LA Gen correctly points out that there are other parties with confidentiality stakes here, and if the Court is to consider sharing any

of these documents, Illinois Union needs to better explain why they should be entitled to the materials. Consequently, the motion for judicial notice will be denied.

VI. Motions to Stay Summary Judgment Ruling and Extend Deadlines

Illinois Union seeks a stay so that it may pursue further discovery regarding the process, which LA Gen vigorously opposes. Essentially, LA Gen argues that this is irrelevant to the issue of coverage generally, and even if it were relevant, Illinois Union had an opportunity to give input on the settlement but did not. According to Illinois Union, however, the documents surrounding negotiations are important and may augment their current defenses. However, in both of its supporting memorandum, Illinois Union failed to satisfactorily explain its position to the Court. Consequently, both motions will be denied.

## **Conclusion**

For the foregoing reasons, LA Gen's Motion for Summary Judgment (Doc. 327) is GRANTED, and Illinois Union's Motion for Summary Judgment (Doc. 298) is DENIED. LA Gen's Motion in Limine (Doc. 324) is also DENIED. Additionally, Illinois Union's Motion for Judicial Notice (Doc. 349) is DENIED. Finally, Illinois Union's Motions for an Extension of the Discovery Deadlines (Doc. 292) and for a Stay of Summary Judgment Proceedings (Doc. 352) are also DENIED.

Signed in Baton Rouge, Louisiana, on August 5, 2015.

_____
**JUDGE JAMES J. BRADY
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**